# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| ex rel. GAIL MCGINNIS, | ) | |
| THE STATE OF ILLINOIS ex rel. GAIL | ) | |
| MCGINNIS, | ) | |
| | ) | Case No.   11-cv-1392 |
| Plaintiff-Relator, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| OSF HEALTHCARE SYSTEM and OSF | ) | |
| HOME CARE SERVICES, | ) | |
| | ) | |
| Defendants. | ) | |

## O R D E R   &   O P I N I O N

This matter is before the Court on Defendants' Motion to Dismiss (Doc. 19) the Complaint (Doc. 1). The Complaint consists of nine counts alleging violations of the federal False Claims Act, 31 U.S.C. § 3729 *et. seq.* (the "FCA") (Counts I, II, III, and VII), the Illinois False Claims Act 740 ILCS 175/1 *et. seq.* (the "IFCA") (Counts IV, V, VI, and VIII), and the Illinois Whistleblower Reward and Protection Act, 740 ILCS 174/20 (Count IX). Defendants assert that Counts I through VI of the Complaint are pled without sufficient particularity as required by Rule 9(b) of the Federal Rules of Civil Procedure. Defendants also assert that 1) Counts I, II, IV and V through VI should be dismissed under Rule 12(b)(6) because Plaintiff has failed to plead *prima facie* FCA claims containing false or fraudulent information that was material to a government payment decision in regard to those Counts; 2) Counts III and VI of the Complaint fail to state claims for conspiracy; and 3) Plaintiff's retaliation claims at Counts VII through IX fail to state claims because Relator does

not sufficiently allege that he took lawful acts in furtherance of an FCA action, that OSF had knowledge that Relator was engaged in protected conduct, or that his resignation was motivated by his protected conduct. For the reasons stated below, Defendants' motion (Doc. 19) is granted in part and denied in part.

## LEGAL STANDARDS

Under Federal Rule of Civil Procedure[1] 8(a)(2), a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." The complaint must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police of Chicago Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). "In evaluating the sufficiency of the complaint, [courts] view it in the light most favorable to the plaintiff, taking as true all well-pleaded factual allegations and making all possible inferences from the allegations in the plaintiff's favor." *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011). "To survive a motion to dismiss, the complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Indep. Trust Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 934–35 (7th Cir. 2012) (citing *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)) (internal quotation marks omitted). "The complaint must actually suggest that the

---

[1] These rules, and not state law, govern purely procedural matters in state cases tried in federal court, and apply to the state law claims pled in Counts IV, V, VI, VIII, and IX. *See Brookshire v. Pennsylvania R. Co.*, 14 F.R.D. 154, 156 (N.D. Ohio 1953).

plaintiff has a right to relief, by providing allegations that raise a right to relief above the speculative level." *Id.* at 935 (citing *Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs.*, 536 F.3d 663, 668 (7th Cir. 2008)) (internal quotation marks omitted). "[A] plaintiff's claim need not be probable, only plausible." *Id.* "To meet this plausibility standard, the complaint must supply enough fact[s] to raise a reasonable expectation that discovery will reveal evidence supporting the plaintiff's allegations." *Id.* (citing *Twombly*, 550 U.S. at 556) (internal quotation marks omitted)).

Rule 9(b) imposes a higher pleading standard than that required under Rule 8. *See Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 446 (7th Cir. 2011). "The [False Claims Act] is an anti-fraud statute and claims under it are subject to the heightened pleading requirements of Rule 9(b)."[2] *United States ex rel. Gross v. AIDS Research Alliance–Chicago*, 415 F.3d 601, 604 (7th Cir. 2005). Rule 9(b) requires a pleading to state with particularity the circumstances constituting the alleged fraud. *See* Fed. R. Civ. P. 9(b); *Pirelli*, 631 F.3d at 441-42. This "ordinarily requires describing the 'who, what, when, where, and how' of the fraud, although the exact level of particularity that is required will necessarily differ based on the facts of the case." *Hofer*, 649 F.3d at 615 (citation omitted).

---

[2] The IFCA is modeled on the federal FCA, *Scachitti v. UBS Fin. Servs.*, 831 N.E.2d 544, 557, 215 Ill. 2d 484, 506 (Ill. 2005), and courts use the FCA for guidance in interpreting the IFCA. *See, e.g, United States ex rel. Humphrey v. Franklin-Williamson Human Servs., Inc.*, 189 F. Supp. 2d 862, 867 (S.D. Ill. 2002) (explaining that the IFCA, then known as the Whistleblower Act, "was virtually identical in all relevant aspects to the FCA," thereby allowing that court "to look to FCA caselaw for guidance").

### FACTUAL BACKGROUND[3]

Plaintiff was employed as the Director of Reimbursement at OSF Home Care Services from March 21, 2011 until July 18, 2011. OSF Home Care Services appears to be some sort of subsidiary of an entity known as the OSF Healthcare System. Plaintiff has named both the OSF Healthcare System and OSF Home Care Services as defendants. The Complaint (Doc. 1) merges and refers to both Defendants as a single defendant, "OSF". OSF offers health care services through many separate facilities operated by four separate service channels known as Hospice, Home Health Services, Durable Medical Equipment ("DME"), and Pharmacy Infusion. Plaintiff alleges that OSF agencies have their own distinct provider numbers that are used to identify claims for reimbursement by Medicare and Medicaid. Only some of OSF's facilities are able to receive Medicare and Medicaid reimbursements.

 OSF used a software program called CPR+ to process its billing data and submit DME claims for reimbursement from payers, including Medicare and Medicaid.  OSF used a different program provided by McKesson for processing Home Health Service Medicare and Medicaid claims. Prior to and during Plaintiff's term of employment with OSF, CPR+ caused several thousand DME claims from the year 2009 to be deemed as "ready" to be submitted to insurers including Medicare and Medicaid. Plaintiff believes these claims have a 70 to 75% error rate

---

[3] As noted above, all well-pled facts must be construed in Plaintiff's favor when ruling on a Motion to Dismiss; so these background facts are drawn from the Complaint. (Doc. 1). The Court will not consider the material attached to Plaintiff's Opposition brief, (Doc. 25), as this was an improper attempt by Plaintiff to amend his Complaint. *See Agnew v. Nat'l. Collegiate Athletic Ass'n*, 683 F.3d 328, 348 (7th Cir. 2012) ("[i]t is a basic principle that the complaint may not be amended by the briefs in opposition to a motion to dismiss").

because they were billed after one year and/or contained errors and omissions of required information with regards to statements of medical necessity, physician orders, diagnoses, physician names, modifiers, non-billable items listed on the claims, and insurance validation. Claims older than one year old were ineligible for Medicare/Medicaid reimbursement. OSF knew of the problems with CPR+. A representative from CPR+ visited OSF and recommended that OSF submit all the claims classified as "ready" to the respective insurers, including Medicare and Medicaid.

On May 13, 2011, Plaintiff advised OSF's CFO, Belinda Muck, that he disagreed with the CPR+ representative's recommendation because the Plaintiff believed the submission of such error-ridden claims would constitute fraud. The CFO disagreed with Plaintiff, reminded him that he was her subordinate, warned him that he should not be talking about fraud and attempted to intimidate him.

In June 2011, Plaintiff witnessed CFO Muck instruct OSF claims processers to submit Home Health Services claims for reimbursement to Medicare and/or Medicaid with false information regarding the facility where the care was administered. These claims had been previously submitted to Medicare and/or Medicaid and rejected. The resubmitted claims were altered to show they came from facilities that were eligible for reimbursement to Medicare and/or Medicaid.

On July 8, 2011, Lisa Peck, an OSF Home Medical Equipment Accounts Receivable Manager, informed the Plaintiff that CFO Muck was upset about writing off two million dollars of untimely claims. On July 11, 2011, CFO Muck signed a termination form for Plaintiff citing resignation effective as of August 15, 2011.

On July 13, 2011, Plaintiff explained to OSF executives and administrators that approximately 7,000 outstanding claims needed to be reviewed to verify and correct information relating to statements of medical necessity, physician orders, diagnoses, physician names, modifiers, non-billable items listed on the claims, insurance validation, and claim timeliness. Plaintiff explained further that this needed to be done at the billing level to ensure accuracy as opposed to simply mass submitting the claims before such a review process.

On July 14, 2011, CFO Muck accused Plaintiff of lying about the need to review the outstanding claims further. CFO Muck then directed the Plaintiff to mass submit the outstanding claims. However, Plaintiff reminded CFO Muck that he believed mass submission of the claims would constitute fraud and he would be obligated to report it since he was a licensed Nursing Home Administrator. CFO Muck became very upset and yelled at Plaintiff to never use the words "fraud and abuse" again. CFO Muck told Plaintiff that she directed certain members of the OSF accounting staff to monitor Plaintiff's activities and report back to her daily. Plaintiff then informed CFO Muck that he would neither instruct his staff to submit the claims nor resign. CFO Muck responded that she would help Relator make the decision to resign. Later that same day, Plaintiff submitted a complaint to the OSF Compliance Committee. Plaintiff returned to work the next day and met with an Employee Relations Manager who informed him that the CEO, AJ Querciagrossa, wanted him to complete an updated action plan outlining his approach to the situation and to prepare data regarding claims that were apparently not ready to be submitted prior to a meeting on July 18, 2011. The Employee Relations Manager

also told Plaintiff that OSF executives determined that no fraud and abuse was being requested of him.

Plaintiff began compiling billing data for a July 18, 2011 meeting requested by the CEO. By the end of the day, the ready to bill claims that were audited showed between a seventy and seventy-five percent error rate. On the morning of July 18, 2011, Plaintiff was informed that the rest of the billing data showed there was a seventy and seventy-five percent error rate for all data that was processed. Later that morning, on July 18, 2011, Relator met with the CEO, the Employee Relations Manager, and the Corporate Human Resources representative. There, he presented an action plan and the findings that the outstanding claims showed a 70-75% error rate. The Employee Relations Manager asked him for a resignation letter but promised that he would not be deemed unable to be rehired and that no bad reference would be given. On July 25, 2011, Plaintiff received a call from an OSF Compliance Officer asking him to do an interview with him and another OSF employee, to which Plaintiff refused.

## DISCUSSION

## I.    Counts I, II, IV and V

In Counts I and IV of the Complaint, Plaintiff alleges OSF "knowingly presented or caused to be presented false or fraudulent claims for payment to" the United States and the State of Illinois (collectively the "government"). In Counts II and V, he alleges OSF "knowingly made, used or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by" the

government.[4] The Complaint discusses two separate schemes. For the first scheme, Plaintiff alleges that OSF knowingly submitted[5] error-ridden, time-barred DME claims intending to have the government make reimbursement for the claims.  (Doc. 1 at 2). For the second scheme, he alleges OSF instructed employees to submit claims for Home Health Services as if the claims arose from treatment provided at a Medicare and/or Medicaid eligible facility, when they in fact, were based on treatment performed at other ineligible facilities. (*Id.*)

### A.   DME Claims for Reimbursement

To establish a claim under this section 31 U.S.C. § 3729(a)(1) of the FCA, a plaintiff must plead three elements: (1) a false or fraudulent claim; (2) which was presented, or caused to be presented, by the defendant to the United States for payment or approval; (3) with the knowledge that the claim was false. *United States ex rel. Fowler v. Caremark RX, L.L.C.*, 496 F.3d 730, 740-41 (7th Cir. 2007) overruled on other grounds by *Glaser v. Wound Care Consultants, Inc.*, 570 F.3d 907 (7th Cir. 2009). A defendant must satisfy the same requirements for the Illinois False Claims Act. *United States ex rel. Upton v. Family Health Network, Inc.*, 900 F. Supp. 2d 821, 828 (N.D. Ill. 2012). The Complaint does not sufficiently put forth the elements of a claim under 31 U.S.C. § 3729(a)(1) for the DME claims.

For example, Plaintiff has not alleged facts that convey that OSF actually submitted any of the claims at issue for reimbursement anywhere in the Complaint. Plaintiff attaches to his Complaint as Exhibit A an excerpt of a training document

---

[4] Plaintiff purports to bring Count II under 31 U.S.C. § 3729(a)(2)(B) but the correct statute is actually § 3729(a)(1)(B).

[5] The Court is being generous by using the term "submitted" because as will be seen, the Plaintiff never explains that these claims were actually submitted.

produced on July 13, 2011 that in his words "reflects 9,213 claims marked as 'ready to bill' for submission to several insurers, including Medicare/Medicaid." (Doc. 1 at 6). This exhibit includes examples of "actual claims and/or accounts" which the Plaintiff believes have a seventy to seventy-five percent error rate because they were either too old to be reimbursed and/or contained errors and omissions of required information such as statements of medical necessity, physician orders, diagnoses, physician names, modifiers, non-billable items listed on the claims, insurance validation.

The first problem with the Complaint is that it leaves it to the Court to speculate what "ready to bill" means. It probably means just what it says—ready to bill—as opposed to "billed" or "already billed." Since these claims are merely marked ready to be billed, then the plausible inference is that they were not actually billed yet and cannot satisfy the second prong of the pleading requirement, which is that the claims were presented to the government for payment. *Caremark RX, L.L.C.*, 496 F.3d at 740. Exhibit A shows an icon on the screen shot that presumably would allow one to generate an invoice if one so chose. Perhaps the Plaintiff would like for the Court to infer that invoices were generated and sent to Medicare and Medicaid for reimbursement but he has not pled that nor has he provided sufficient facts for the Court to infer that this is what occurred. Plaintiff has not provided anything from which the Court can infer that these claims were actually submitted for payment to and/or paid by the government. For example, Plaintiff has not described or referred to any invoices, bills or receipts of payments

made by the government in his Complaint, nor has he attached any such items as exhibits.

Plaintiff argues that under *United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849 (7th Cir. 2009), invoices are unnecessary and he has pled sufficient facts to infer either that the DME claims submissions actually occurred or that he can prove they were submitted and reimbursed ultimately after the case has progressed through discovery. In *Lusby*, the relator was an engineer, not an employee with any type of connection to the defendant's billing operations. *Id*. at 850. The relator complained that despite contractual obligations to deliver quality parts to the government and to certify to the quality of such parts as a condition of remuneration, the defendant had in fact knowingly submitted inferior parts and billed and collected payment for such inferior parts. 570 F.3d at 853. The defendant claimed the relator's inability to produce an actual invoice doomed his claim. *Id*. at 854. The relator did not possess an actual bill or invoice, but he alleged specific parts, dates, and details of payment in his complaint. *Id*. In short, the relator provided specific factual allegations concerning how the defendant submitted false claims to the government. *Id*. at 853-54.

In stark contrast to the relator in *Lusby*, 570 F.3d at 850, Plaintiff here was deeply involved in OSF's billing. Plaintiff alleges he was the Director of Reimbursement and was responsible for planning, directing, executing and evaluating the billing and reimbursement functions for OSF. (Doc. 1 at 5). Despite his familiarity and access to OSF's billing and reimbursement procedures, Plaintiff does not allege any dates, amounts, or other details of payments in his Complaint

that would allow the Court to infer DME claims were actually submitted and/or reimbursed by the government.

The complaint in *Lusby* did not leave the court to speculate on whether claims were ever submitted. The relator in *Lusby* knew of and pled specific details about the underlying contract and requisite facts that supported his allegations, but was unable to present information evidencing actual payment by the government. 570 F.3d at 853-54. Here, Plaintiff does not allege any facts from which a court can fairly conclude the DME claims at issue were ever submitted for payment and reimbursed.

Moreover, the Complaint actually presents facts that lead the Court to the conclusion that these DME claims at issue were not submitted for reimbursement. The Compliant states that CFO Muck was prepared to write these claims off and that is why she was upset with Plaintiff. (Doc. 1 at 8). A willingness, no matter how begrudged or resentful, to write off claims conveys no other impression other than the CFO was willing to <u>not seek reimbursement</u> for the untimely, error-ridden DME claims. Furthermore, the Complaint clearly states that no claims were submitted before July 14, 2001 because Plaintiff states on that date the CFO ordered him to submit them but he refused. (Doc. 1 at 9). Such refusal was one of the purported grounds for which he was constructively discharged. (*Id.* at 20). Similarly, there is no allegation that the DME claims were submitted for payment at any time before or after Plaintiff resigned.

Plaintiff has not even clearly explained why the DME claims are false or fraudulent in the first place. Plaintiff lists several categories of required

information for the DME claims that the CPR+ software allegedly botched but he does not explain in the Complaint how any of the categories other than the date of the claim are material to the government's decision to pay the claims. He does not allege that DME Medicare and Medicaid claims have incorrect or false dates on them. Instead, he alleges that the dates show the claims are untimely.[6] Moreover his Complaint is devoid of any allegations that the CPR+ software caused the DME claims to show incorrect or falsified dates on any invoices that were presented to the government for payment. After reading the entire Complaint in the light most favorable to the Plaintiff, it is evident that all the Plaintiff has really pled is that the CPR+ software allowed untimely claims to exist in the OSF system as "ready to be billed." This is a far cry from a plausible allegation that OSF obtained government payments through the submission of knowingly false or fraudulent claims.  Therefore, the Court concludes that the DME scheme as pled does not state a claim upon which relief can be granted as violations of the federal or Illinois FCA.

**B.      Home Health Service Claims for Reimbursement**

The Complaint is similarly factually deficient, yet even more confusing, as to the Home Health Services claims. Plaintiff alleges in the Complaint that CFO Muck instructed OSF claims processers to submit **Home Health Services** claims for reimbursement to Medicare and/or Medicaid with false information regarding the facility where the care was administered. (Doc. 1 at 12). But in his Opposition,

---

[6] In the Complaint, Plaintiff discusses how Medicare and Medicaid rejected Home Health Services claims that showed on their face that they related to ineligible facilities. It stands to reason then that Medicare and Medicaid would be able to reject DME claims that indicated they were from ineligible time periods.  Again, the Complaint does not indicate the DME claims that were marked "ready to bill" had incorrect or false dates associated with them.

Plaintiff responds to the motion to dismiss by discussing claims associated with OSF's **Hospice** channel. (Doc. 25 at 12). The Complaint sheds no light on why the location of a facility would even matter for the reimbursement of claims associated with health care rendered in homes, assuming of course that this is the type of care rendered under the **Home Health Services** channel.

Plaintiff alleges that some of OSF's "facilities" are able to qualify for Medicare and Medicaid reimbursements while other "facilities" are not. (Doc. 1 at ¶21). However, he does not explain in the Complaint what distinguishes the qualifying facilities from the non-qualifying facilities.

Plaintiff further alleges that OSF "agencies" have their own distinct **provider numbers** that are used to **identify claims for reimbursement** by Medicare and Medicaid. However, he never explains what the term "agency" means. It is not clear whether Plaintiff is using the term "agency" in regard to one of the four service channels—Home Health Services, DME, Hospice or Pharmacy Infusion—or if the term refers to one of OSF's several facilities—as in the brick and mortar locations.

The Court is left to speculate on how provider numbers are even relevant to the scheme. Plaintiff states the identifying feature on a claim for reimbursement is the provider number. Yet Plaintiff never alleges that the provider numbers were falsified on claims submitted for reimbursement to Medicare and Medicaid or that provider numbers vary by location. In the Opposition, he gives the example that **Hospice** claims were billed originally as if they were rendered in Galesburg, IL yet rebilled as if they took place in Peoria, IL. Aside from the fact that he is talking

about **Hospice** claims instead of **Home Health Service** claims, there is no allegation that the Galesburg and Peoria locations have different provider numbers that have been switched or falsified on claims to Medicare or Medicaid.

In short, there are no factual allegations in the Complaint for the Court to understand either 1) why Hospice reimbursement claims in Galesburg, Peoria or any other location are material to the government's decision to pay Home Health Service reimbursement claims or 2) how Home Health Service reimbursement claims could be deemed false if the information changed in these claims refers to the locations where the care was administered, which is what Plaintiff has alleged, and not the provider numbers of the providers who administered the care, which he has failed to allege.  The scheme regarding Home Health Service claims is confusing as pled and does not state legal claims upon which relief can be granted for violations of the federal or Illinois FCA.

## II.    Conspiracy Counts III[7] and VI.

Plaintiff alleges two counts of conspiracy. Count III alleges "Defendant knowingly conspired to defraud the United States by getting false or fraudulent claims allowed or paid by the United States" in contravention of 31 U.S.C. § 3729(a)(1)(C). Count VI alleges "Defendant knowingly conspired to defraud the State of Illinois by getting false or fraudulent claims allowed or paid by the State of Illinois" in contravention of 740 ILCS 175/3(a)(1)(C). Defendants contend that Plaintiff has failed to allege the existence of either a co-conspirator or an

---

[7] Plaintiff purports to bring Count III under 31 U.S.C. § 3729(a)(3)(C) but the correct paragraph is actually (1)(C).

agreement. (Doc. 20 at 10). Plaintiff has failed to discuss his conspiracy claims in his Opposition brief. (Doc. 25).

The Seventh Circuit has held that "general civil conspiracy principles apply" to FCA conspiracy claims. *United States ex rel. Durcholz v. FKW Inc.*, 189 F.3d 542, 545 n. 3 (7th Cir. 1999) (citing *United States v. Murphy*, 937 F.2d 1032, 1039 (6th Cir. 1991)). A conspiracy must have an agreement by two or more parties to accomplish some goal or goals. *See e.g.*, *Cooney v. Casady*, 735 F.3d 514, 519 (7th Cir. 2013); *United States ex rel. Garst v. Lockheed Integrated Solutions Co.*, 158 F. Supp. 2d 816, 824 (N.D. Ill. 2001). A conspiracy also requires the allegation of an act in furtherance of the agreement. *Indep. Trust Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d at 939. A conspiracy premised upon fraudulent conduct must be pled with the same specificity as a fraud claim. *Goldberg v. Rush Univ. Med. Ctr.*, 929 F. Supp. 2d 807, 825 (N.D. Ill. 2013) (dismissing an FCA conspiracy claim for failure to plead sufficient detail pursuant to Federal Rule of Civil Procedure 9(b)) (citing *Borsellino v. Goldman Sachs Group, Inc.*, 477 F.3d 502, 507 (7th Cir. 2007)). In this case, Plaintiff's allegations do not satisfy Rule 8(a)(2) as described in *Ashcroft v. Iqbal*, 556 U.S. 662, let alone the heightened specificity of Rule 9(b).

Plaintiff has alleged no details demonstrating how OSF[8] conspired to defraud the government with anyone. Plaintiff does not name a co-conspirator or identify an

---

[8] Despite naming two entities as defendants in this lawsuit, OSF Healthcare System and OSF Home Care Services, Plaintiff treats them as a single entity throughout his Complaint. For example, Plaintiff states in the caption that there is only one Defendant. (Doc. 1 at 1). Similarly in paragraphs 17 and 18 of the Complaint, Plaintiff writes that "Defendant OSF is incorporated in the State of Illinois" and that "Defendant OSF is a multi-state corporation." So there is no reason for the Court to infer that Plaintiff means to complain that OSF Healthcare

agreement to defraud the government. Without specific information, Plaintiff's allegation of conspiracy is a mere label or legal conclusion entitled to no weight. *See Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

The only non-OSF actors mentioned in the Complaint are CPR+ and McKesson and their involvement in the matters complained of as pled do not amount to conspiracy to knowingly defraud the government. Plaintiff writes that CPR+ software was used to process DME claims and McKesson software was used to process Home Health Services claims. (Doc. 1 at 6). However, Counts III and VI do not specify whether they relate to DME claims or Home Health Services claims. Nothing in the Complaint is mentioned that would give the reader the impression that McKesson was remotely involved in a conspiracy with OSF surrounding Home Health Services claims.

As to CPR+, Plaintiff alleges is that sometime between May 9 and May 13, 2011, a representative of CPR+ recommended OSF submit DME claims in mass and that the "recommendation was made in the interest of maximizing the amount of revenue that could be presented" to a future OSF board meeting. (Doc. 1 at 7-8).

---

System and OSF Home Care Services are two distinct entities that conspired to submit false claims to the government. Even if Plaintiff means to allege that OSF Healthcare System and OSF Home Care Services conspired, such an argument would probably fail as a matter of law because this Court has previously found that the "intracorporate conspiracy doctrine" bars conspiracy claims under 31 U.S.C. § 3729(a)(1) where all the alleged conspirators are actors within the same corporate entity. *United States ex rel. Chilcott v. KBR, Inc.*, No. 09-CV-4018, 2013 WL 5781660, at *10-12 (C.D. Ill. Oct. 25, 2013); *see also U.S. ex rel. Brooks v. Lockheed Martin Corp.*, 423 F. Supp. 2d 522, 528 (D. Md. 2006) aff'd in part, dismissed in part, 237 F. App'x 802 (4th Cir. 2007). As the Complaint is currently drafted, the Court is left with the impression that OSF Healthcare System and OSF Home Care Services are parts of the same corporate entity.

Such barebones pleading does not convey the existence of a conspiracy to defraud the government.

A plaintiff pleading a conspiracy to commit fraud cannot leave it up to the Court to manufacture his claim. *See, e.g., United States ex rel. Garst v. Lockheed Integrated Solutions Co.*, 158 F. Supp. 2d at 824-25 (dismissing an FCA conspiracy claim where there were no allegations of a co-conspirator, an agreement, or underlying false claims for payment). Was the CPR+ representative the purported co-conspirator? (Doc. 1 at 7-8). Was maximizing potential revenue for an OSF board meeting the conspiratorial goal?  (Doc. 1 at 8). Was the recommendation to submit the DME claims the agreement?[9] (*Id.* at 6).

In short, the facts alleged in the Complaint do not sufficiently convey a conspiracy to knowingly get "false or fraudulent claims allowed or paid by" the government under Federal Rules of Civil Procedure 8(a) or 9(b). (Doc. 1 at 17 and 18). Consequently, Counts III and VI are dismissed without prejudice.

## III.   Retaliation Claims

In Counts VII and VIII, Plaintiff alleges that OSF "threatened, harassed, and discriminated against Relator in the terms and conditions of his employment because of the lawful acts done by Relator in furtherance of an action under this section." (Doc. 1 at 18-19). He alleges in Count IX that OSF retaliated against him "for refusing to participate in activities that would result in a violation of State or Federal laws, rules or regulations." (Doc. 1 at 20).

---

[9] These are all questions the Complaint should have answered, or at least the Plaintiff should have attempted to answer in his Opposition, but he chose not to argue in support of his conspiracy counts at all. (*See generally* Doc. 25).

**A.        31 U.S.C. § 3730(h)(1) and 740 ILCS 175/4(g)(1)**

In order to survive a motion to dismiss, a complaint alleging FCA retaliation claims brought pursuant to 31 U.S.C. §3730(h)(1) and 740 ILCS 175/4(g)(1) must contain factual allegations that if proven would establish that 1) the plaintiff was acting in furtherance of an FCA enforcement action *or other efforts to stop violations of the FCA*, 2) the employer knew plaintiff was engaged in protected conduct, and 3) the employer was motivated to take an adverse employment action against the plaintiff because of the protected conduct. 31 U.S.C. § 3730(h) (2012) (emphasis added); *Brandon v. Anesthesia & Pain Mgmt. Assocs., Ltd.*, 277 F.3d 936, 944 (7th Cir. 2002); *see, e.g.*, *United States ex rel. Wildhirt v. AARS Forever, Inc.*, No. 09 C 1215, 2011 WL 1303390, at *6 (N.D. Ill. Apr. 6, 2011). Courts analyze the conduct the plaintiff engaged in and his purpose for doing so to help determine whether these elements have been sufficiently pled. *Luckey v. Baxter Healthcare Corp.*, 2 F.Supp.2d 1034, (N.D. Ill. 1998), *aff'd by* 183 F.3d 730 (7th Cir. 1999).

As an initial matter, the Court has already found that Plaintiff has not sufficiently plead either how the DME claims were false or fraudulent in the first place or that the error-ridden DME claims were presented to the government for payment.[10] Without finding that the Plaintiff has sufficiently pled the claims for reimbursement were fraudulent or ever presented to the government, the Court cannot conclude that the allegations support a finding that Plaintiff was acting in furtherance of an FCA enforcement action or other efforts to stop violations of the FCA.  Thus, Counts VII and VIII are dismissed.

---

[10] Plaintiff has not made any allegations that he took any action in regard to the Home Health Service claims to precipitate OSF retaliation.

Should Plaintiff choose to file an amended complaint, he should take heed that the Complaint only alleges that Plaintiff was engaged "in furtherance of an action," (Doc. 1 at 19), not that he engaged in "other efforts to stop violations of the FCA". Plaintiff alleges he informed his OSF superiors that submitting the DME claims would be fraud and abuse. (Doc. 1 at 8). He told his CFO that if OSF submitted the DME claims he would have to report it because he is a licensed Nursing Home Administrator. (Doc. 1 at 9). Plaintiff does not say to whom he would report the submission though nor does he provide any nexus between the profession of Nursing Home Administrator and the False Claims Act or its Illinois equivalent. He also lodged internal complaints with the OSF Compliance Committee.  (Doc. 1 at 9). The Plaintiff's conduct was squarely aimed at preventing OSF from submitting the DME claims.

While these allegations would probably suffice to establish "other efforts to stop violations of the FCA" under 31 U.S.C. §3730(h)(1) had the Court found that Plaintiff sufficiently pled the underlying claims for payment were actually false or fraudulent or presented to the government, they do not suffice to show that Plaintiff was engaged "in the furtherance of an FCA enforcement action." The case law is clear that simply informing one's employer that certain actions are "illegal," "improper," or "fraudulent," without any explicit mention of the possibility that the employee may sue, will not suffice to show the plaintiff was acting in furtherance of an FCA enforcement action. *Brandon*, 277 F.3d at 944-45 (court held merely trying to convince superiors to comply with Medicare billing regulations did not constitute protected activity). This is especially true for an employee like Plaintiff, whose

duties include managing the company's billing practices. 277 F.3d at 945, *Fanslow v. Chicago Mfg. Ctr., Inc.*, 384 F.3d 469, 484 (7th Cir. 2004).

Should Plaintiff choose to file an amended complaint and maintain that he only acted in furtherance of an FCA action, the Court will not assume that he intends to allege his actions also constituted "other efforts" under the statute. The Court will hold Plaintiff responsible for what he explicitly pleads.

**B.      740 ILCS 174/20**

Chapter 740 of the Illinois Compiled Statutes, Act 174, Section 20 prohibits an employer from retaliating against an employee for refusing to participate in an activity that would result in a violation of a State or federal law, rule, or regulation. 740 ILCS 174/20 (2009).  This is the only claim in the Complaint that has been sufficiently pled.

To maintain an action under 740 ILCS 174/20, a plaintiff need only plead facts that make it plausible that (1) he refused to participate in an activity that would result in a violation of a state or federal law, rule, or regulation and (2) his employer retaliated against him because of that refusal. *Sardiga v. N. Trust Co.*, 948 N.E.2d 652, 657 (Ill. App. Ct. 2011). That is exactly what the Plaintiff has pled. He states that he was subjected to unwanted scrutiny, bullying and then constructively discharged, for refusing to participate in what he thought would amount to violations of the law. (Doc. 1 at 8, 9, and 11). The unwanted scrutiny, bullying and constructive discharge make up the retaliation. His refusal to direct his staff to submit the error-ridden DME claims constitutes the required refusal to participate. (Doc. 1 at 9).

While the Court has concluded that the fraudulence of the DME claims for reimbursement has not been sufficiently described in the Complaint, this pleading sufficiently conveys that Plaintiff thought submitting the claims would constitute fraud. Lastly, that Plaintiff failed to identify a specific law, statute or regulation in the Complaint is no bar to this particular claim because there is no question that fraud is illegal. Thus, it is sufficient that Plaintiff thought submitting the DME claims would be fraudulent and hence, unlawful.  Count IX stands as pled.

## CONCLUSION

For the reasons stated above Counts I, II, III, IV, V and VI are dismissed for failure to comply with Federal Rules of Civil Procedure 9(b) and 12(b)(6) because they lack the requisite detail to demonstrate that relief can be granted. Counts VII and VIII are dismissed under Rule 12(b)(6) because they do not state claims upon which relief can be granted without the necessary predicate allegations that Defendant actually submitted fraudulent claims to the government for reimbursement. Count IX, an Illinois state law claim, remains.

The Court finds it appropriate to grant Plaintiff leave to amend his complaint to address the problems described in this Order and Opinion. Plaintiff may amend his complaint to comply with federal pleading requirements within twenty-one days of the date of this Order. Defendant may then file a responsive pleading or an appropriate motion within twenty-one days thereafter. Should Plaintiff fail to amend his complaint within the time allotted, the Court will reassess whether it will retain supplemental jurisdiction over this action.

IT IS THEREFORE ORDERED that Defendant's Motion to Dismiss (Doc. 19) is GRANTED IN PART and DENIED IN PART. Plaintiff is GRANTED leave to amend his complaint within twenty-one days.

Entered this <u>31st</u> day of January, 2014.

s/ Joe B. McDade
_____
JOE BILLY McDADE
United States Senior District Judge
