# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| ex rel. GAIL MCGINNIS, | ) | |
| THE STATE OF ILLINOIS ex rel. GAIL | ) | |
| MCGINNIS, | ) | |
| | ) | Case No.   11-cv-1392 |
| Plaintiff-Relator, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| OSF HEALTHCARE SYSTEM and OSF | ) | |
| HOME CARE SERVICES, | ) | |
| | ) | |
| Defendants. | ) | |

## O R D E R   &   O P I N I O N

This matter is before the Court on Defendants' Motion to Dismiss Relator's
First Amended Complaint (Doc. 35). The First Amended Complaint (Doc. 34)
consists of nine counts alleging violations of the federal False Claims Act, 31 U.S.C.
§ 3729 *et. seq.* (2009) (the "FCA") (Counts I, II, III, and VII), the Illinois False
Claims Act 740 ILCS 175/1 *et. seq.* (2010) (the "IFCA") (Counts IV, V, VI, and VIII),
and the Illinois Whistleblower Act, 740 ILCS 174/20 (2009) (Count IX). Defendants
assert that 1) Counts I, II, III, IV, V and VI of the First Amended Complaint should
be dismissed under Rule 12(b)(6) because Relator has failed to plead *prima facie*
elements of FCA claims; 2) Counts III and VI of the First Amended Complaint fail
to state claims for conspiracy; and 3) Relator's retaliation claims at Counts VII and
VIII fail to state claims because Relator does not sufficiently allege that he took
lawful acts in furtherance of an FCA action. Defendants also assert that Counts I
through VI are pled without sufficient particularity as required by Rule 9(b) of the

Federal Rules of Civil Procedure. For the reasons stated below, Defendants' motion (Doc. 35) is granted.

**LEGAL STANDARDS**

Under Federal Rule of Civil Procedure[1] 8(a)(2), a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." The complaint must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. v. Twombly*, 550 U.S. 544, 555 (2007).

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police of Chicago Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). "In evaluating the sufficiency of the complaint, [courts] view it in the light most favorable to the plaintiff, taking as true all well-pleaded factual allegations and making all possible inferences from the allegations in the plaintiff's favor." *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011). "To survive a motion to dismiss, the complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Indep. Trust Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 934–35 (7th Cir. 2012) (citing *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)) (internal quotation marks omitted). "The complaint must actually suggest that the plaintiff has a right to relief, by providing allegations that raise a right to relief above the speculative level." *Id.* at 935 (citing *Windy City Metal Fabricators &*

---

[1] These rules, and not state law, govern purely procedural matters in state cases tried in federal court, and apply to the state law claims pled in Counts IV, V, VI, VIII, and IX. *See Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc.*, 536 F.3d 663, 670-72 (7th Cir. 2008); *Brookshire v. Pennsylvania R. Co.*, 14 F.R.D. 154, 156 (N.D. Ohio 1953).

*Supply, Inc. v. CIT Tech. Fin. Servs.*, 536 F.3d 663, 668 (7th Cir. 2008)) (internal quotation marks omitted). "[A] plaintiff's claim need not be probable, only plausible." *Id.* "To meet this plausibility standard, the complaint must supply enough fact[s] to raise a reasonable expectation that discovery will reveal evidence supporting the plaintiff's allegations." *Id.* (citing *Twombly*, 550 U.S. at 556) (internal quotation marks omitted)).

Rule 9(b) imposes a higher pleading standard than that required under Rule 8. *See Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 446 (7th Cir. 2011). "The [False Claims Act] is an anti-fraud statute and claims under it are subject to the heightened pleading requirements of Rule 9(b)."[2] *United States ex rel. Gross v. AIDS Research Alliance–Chicago*, 415 F.3d 601, 604 (7th Cir. 2005). Rule 9(b) requires a pleading to state with particularity the circumstances constituting the alleged fraud. *See* Fed. R. Civ. P. 9(b); *Pirelli*, 631 F.3d at 441-42. This "ordinarily requires describing the 'who, what, when, where, and how' of the fraud, although the exact level of particularity that is required will necessarily differ based on the facts of the case." *Hofer*, 649 F.3d at 615 (citation omitted).

---

[2] The IFCA is modeled on the federal FCA, *Scachitti v. UBS Fin. Servs.*, 831 N.E.2d 544, 557, 215 Ill. 2d 484, 506 (Ill. 2005), and courts use the FCA for guidance in interpreting the IFCA. *See, e.g, United States ex rel. Humphrey v. Franklin-Williamson Human Servs., Inc.*, 189 F. Supp. 2d 862, 867 (S.D. Ill. 2002) (explaining that the IFCA, then known as the Whistleblower Act, "was virtually identical in all relevant aspects to the FCA," thereby allowing that court "to look to FCA caselaw for guidance").

Gail McGinnis (the "Relator") was employed as the Director of Reimbursement at OSF Home Care Services from March 21, 2011 until July 18, 2011. Relator has named both the OSF Healthcare System and OSF Home Care Services as defendants. The First Amended Complaint (Doc. 34) refers to both Defendants as a single defendant, "OSF". OSF offers health care services through many separate facilities operating under four separate service areas known as Hospice, Home Health Services, Durable Medical Equipment ("DME"), and Pharmacy Infusion. OSF agencies have their own unique provider numbers that are used to identify where specific treatment originated in claims for reimbursement by Medicare and Medicaid. Only some of OSF's facilities are able to receive Medicare and Medicaid reimbursements. In particular, OSF's Galesburg Hospice was an unapproved facility for the reimbursement of Medicare claims, while its Peoria Hospice facility was approved.

OSF used a software program called CPR+ to process its billing data and to submit DME claims for reimbursement to payers, including Medicare and Medicaid. OSF used a different program provided by McKesson for processing Home Health Service Medicare and Medicaid claims. Prior to and during Relator's term of employment with OSF, CPR+ caused several thousand DME claims from the year 2009 to be deemed as "ready" to be submitted to insurers including Medicare and Medicaid. Relator believes these claims have a seventy to seventy-five% error rate

---

[3] As noted above, all well-pled facts must be construed in the plaintiff's favor when ruling on a Motion to Dismiss, so these background facts are drawn from the First Amended Complaint. (Doc. 34).

because they were billed after one year and/or contained errors and omissions of required information with regards to statements of medical necessity, physician orders, diagnoses, physician names, modifiers, non-billable items listed on the claims, and insurance validation. Claims older than one year old are ineligible for Medicare/Medicaid reimbursement. OSF knew of the problems with CPR+. A representative from CPR+ visited OSF and recommended that OSF submit all the claims classified as "ready" to the respective insurers, including Medicare and Medicaid.

On May 13, 2011, Relator advised OSF's Chief Financial Officer ("CFO"), Belinda Muck, that he disagreed with the CPR+ representative's recommendation because the Relator believed the submission of such error-ridden claims would constitute fraud. The CFO disagreed with Relator, reminded him that he was her subordinate, warned him that he should not be talking about fraud and attempted to intimidate him.

In or around June 2011, Relator witnessed CFO Muck instruct OSF claims processers to submit Home Health Services claims for reimbursement to Medicare and/or Medicaid with false information regarding the facility where the care was administered. These claims had been previously submitted to Medicare and/or Medicaid and rejected. The resubmitted claims were altered to show they came from facilities that were eligible for reimbursement to Medicare and/or Medicaid.

On July 8, 2011, Lisa Peck, an OSF Home Medical Equipment Accounts Receivable Manager, informed the Relator that CFO Muck was upset about writing

off two million dollars of untimely claims. On July 11, 2011, CFO Muck signed a termination form for Relator citing resignation effective as of August 15, 2011.

On July 13, 2011, Relator explained to OSF executives and administrators that approximately 7,000 outstanding claims needed to be reviewed to verify and correct information relating to statements of medical necessity, physician orders, diagnoses, physician names, modifiers, non-billable items listed on the claims, insurance validation, and claim timeliness. Relator explained further that this needed to be done at the billing level to ensure accuracy as opposed to simply mass submitting the claims before such a review process.

On July 14, 2011, CFO Muck accused Relator of lying about the need to review the outstanding claims further. CFO Muck then directed the Relator to mass submit the outstanding claims. However, Relator reminded CFO Muck that he believed mass submission of the claims would constitute fraud and he would be obligated to report it since he was a licensed Nursing Home Administrator. CFO Muck became very upset and yelled at Relator to never use the words "fraud and abuse" again. CFO Muck told Relator that she directed certain members of the OSF accounting staff to monitor Relator's activities and report back to her daily. Relator then informed CFO Muck that he would neither instruct his staff to submit the claims nor resign. CFO Muck responded that she would help Relator make the decision to resign. Later that same day, Relator submitted a complaint to the OSF Compliance Committee. Relator returned to work the next day and met with an Employee Relations Manager who informed him that the CEO, AJ Querciagrossa, wanted him to complete an updated action plan outlining his approach to the

situation and to prepare data regarding claims that were apparently not ready to be submitted prior to a meeting on July 18, 2011. The Employee Relations Manager also told Relator that OSF executives determined that no fraud and abuse was being requested of him.

Relator began compiling billing data for a July 18, 2011 meeting requested by the CEO. By the end of the day on July 15, 2011, the ready to bill claims that were audited showed between a seventy and seventy-five percent error rate. On the morning of July 18, 2011, Relator was informed that the rest of the billing data showed there was a seventy and seventy-five percent error rate for all data that was processed. Later that morning, on July 18, 2011, Relator met with the CEO, the Employee Relations Manager, and the Corporate Human Resources representative. There, he presented an action plan and the findings that the outstanding claims showed an error rate of seventy to seventy-five percent. The Employee Relations Manager asked him for a resignation letter but promised that he would not be deemed "unable to be rehired" and that no bad reference would be given. On July 25, 2011, Relator received a call from an OSF Compliance Officer asking him to do an interview with him and another OSF employee, to which Relator refused.

DISCUSSION

## I.    Counts I, II, IV and V

In Counts I and IV of the First Amended Complaint, Relator alleges OSF "knowingly presented or caused to be presented false or fraudulent claims for payment to" the United States and the State of Illinois (collectively the "Governments") in violation of 31 U.S.C. § 3729(a)(1)(A). In Counts II and V, he

7

alleges OSF "knowingly made, used or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by" the Governments in violation of 31 U.S.C. § 3729(a)(1)(B). The First Amended Complaint discusses two separate schemes. In one scheme, Relator alleges OSF instructed employees to submit claims for Home Health Services as if the claims arose from hospice treatment provided at a Medicare and/or Medicaid eligible facility, when in fact, they were based on hospice treatment performed at other ineligible facilities. (Doc. 34 at 2). For the second scheme, he alleges that OSF knowingly submitted time-barred DME claims and DME claims that lacked sufficient documentation intending to have the Governments reimburse the claims. (Doc. 34 at 2)

A.    **Home Health Service Claims for Reimbursement**

The Court previously found that the scheme regarding Home Health Service claims was confusing as pled and did not state legal claims upon which relief can be granted for violations of the federal or Illinois FCA. (Doc. 30 at 14). The primary reason for the confusion was that the original complaint conflated Home Health Services claims with Hospice claims with no explanation of how the two categories of claims are related and no explanation of why the location of a Hospice facility would matter for the reimbursement of Home Health Services. (Doc. 30 at 13). Since the claim for relief was alleged to involve Home Health Services yet the Relator only discussed separate Hospice services, the Court concluded the original complaint failed to apprise OSF of "fair notice of what the claim" really was and the grounds upon which it rested. *See Twombly*, 550 U.S. at 555. Unfortunately, Relator has

pled nothing new to explain his continued use of Hospice claims to illustrate the purported falsity or fraudulence of Home Health Services claims.

Relator alleges in the First Amended Complaint that he witnessed CFO Muck instruct OSF claims processers to submit **Home Health Services** claims for reimbursement to Medicare and/or Medicaid with false information regarding the facility where the care was administered. (Doc. 34 at 14-15). On page sixteen of the First Amended Complaint, Relator alleges applicable **hospice** regulations disallowed providers from claiming Medicare reimbursement for **hospice** services provided at an ineligible location. Relator alleges OSF knew of this requirement and knew of prior claims being rejected because they were related to **hospice** services provided at the unapproved/ineligible Galesburg **Hospice** facility, yet OSF knowingly instructed its billers to resubmit the claims as if they were for the reimbursement of **hospice** services rendered at an approved/eligible Peoria **Hospice** facility. (Doc. 34 at 16).

In its Opposition brief to Defendants' motion to dismiss, Relator now refers to these claims as his "Home Health/ Hospice" claims and argues that "[i]t does not matter if the Home Health service was hospice (or anything else)." (Doc. 39-1 at 3). The Court disagrees that it does not matter whether Home Health Services were hospice services because Relator clearly alleges in the First Amended Complaint that 1) the regulations at issue <u>only</u> apply to hospice services (Doc. 34 at ¶56) and 2) OSF provides Home Health Services and Hospice as <u>separate</u> healthcare services (Doc. 34 at ¶17). Thus, the scheme alleged in the First Amended Complaint concerns Home Health Service claims not Hospice claims, yet the First Amended

Complaint does not provide any nexus between hospice services and home health services. For instance, Relator does not allege that OSF renders hospice services under the umbrella of its Home Health Services or even that services provided as Home Health Services are rendered at OSF's Hospice facilities.

Paragraph fifty-three of the First Amended Complaint provides that "Relator witnessed OSF's CFO instruct Arlene Hunter and Lisa Davies, Reimbursement Specialists for OSF, to resubmit *the claims*" to Medicare and/or Medicaid in a manner that reflected that "*the claims*" were related to treatment at another *Home Health* facility…" (emphasis added). The First Amended Complaint does not mention whether these particular "claims" are for hospice services or whether the "Home Health facility" referred to is either the Galesburg or Peoria Hospice facility.

Again, nowhere in the First Amended Complaint does Relator allege that Home Health Services were performed at the Hospice facilities. Although Relator specifically identifies the Galesburg and Peoria Hospice facilities, he never alleges that <u>Home Health Services</u> were performed at either facility. The closest Relator comes to making such a specific allegation is in paragraph fifty-two of the First Amended Complaint where he alleges that Home Health services were performed at "non-eligible facilities," the claims for these services were initially rejected by the Government, but later resubmitted as if they were performed at "eligible facilities." But Relator never specifies that the "facilities" to which he refers are the Galesburg or Peoria Hospice facilities. Nor does Relator allege that the regulations disallowing payment for services rendered at non-eligible facilities pertain to OSF's Home Health Services.

The First Amended Complaint makes factual allegations that OSF submitted false hospice claims and continues to assert that claims for the reimbursement of hospice services relating to Hospice facilities demonstrate the purported fraudulence of Home Health Service claims. Facts supporting specific allegations regarding Home Health Services claims would support Relator's theory. Instead, Relator is comparing apples to oranges with no explanation for why one should overlook the clear distinction between the fruits.

In sum, the First Amended Complaint unambiguously complains that OSF submitted fraudulent Home Health Services claims for reimbursement not Hospice claims, yet only presents specific factual allegations concerning the latter category of claims. Therefore, the Court finds that the allegations of hospice claims resubmitted with false Hospice locations do not plausibly state legal claims upon which relief can be granted for violations of the federal or Illinois FCA in regard to a scheme involving Home Health Services claims. In simpler words, Relator has not pled factual allegations that make it plausible that OSF's Home Health Services claims were false or fraudulent, and the claim must be dismissed pursuant to Rule 12(b)(6).

This is Relator's second attempt at pleading false claims for reimbursement arising out of Home Health Services and he continues to focus on Hospice regulations and billing practices. Therefore, the Court is of the opinion that Relator

will never be able to plead proper FCA claims relating to Home Health Services. Therefore, this claim is dismissed with prejudice.[4]

## B.     DME Claims for Reimbursement

To establish a claim under section 31 U.S.C. § 3729(a)(1)(A) of the FCA, a relator must plead three elements: (1) a false or fraudulent claim; (2) which was presented, or caused to be presented, by the defendant to the United States for payment or approval; (3) with the knowledge that the claim was false. *See United States ex rel. Fowler v. Caremark RX, L.L.C.*, 496 F.3d 730, 740-41 (7th Cir. 2007) (dealing with pre-2009 version of the statute) overruled on other grounds by *Glaser v. Wound Care Consultants, Inc.*, 570 F.3d 907 (7th Cir. 2009). To establish a claim under section 31 U.S.C. § 3729(a)(1)(B) of the FCA, a relator must also plead three elements: "(1) the defendant made a statement in order to receive money from the government, (2) the statement was false, and (3) the defendant knew it was false." *United States ex rel. Crews v. NCS Healthcare of Illinois, Inc.*, 460 F.3d 853, 856 (7th Cir. 2006) (dealing with pre-2009 version of the statute). A defendant must satisfy the same requirements under the Illinois False Claims Act. *United States ex rel. Upton v. Family Health Network, Inc.*, 900 F. Supp. 2d 821, 828 (N.D. Ill. 2012). The First Amended Complaint does not set forth the elements of a viable claim under 31 U.S.C. § 3729(a)(1)(A) or (B) for the DME claims.

---

[4] When a claim for which relief cannot be obtained is alleged and the defending party succeeds on a 12(b)(6) motion, the dismissal should be with prejudice. *Kamelgard v. Macura*, 585 F.3d 334, 339 (7th Cir. 2009). Amendment of the claim will only be allowed upon motion and upon a showing that such amendment would not be futile. *See Stanard v. Nygren,* 658 F.3d 792, 797 (7th Cir. 2011).

## 1. Untimely DME Claims Cannot Be Deemed False Simply By Virtue Of Their Tardiness.

Relator asserts that "many of the DME claims were more than one year old at the time of submission, making them ineligible for Medicare and/or Medicaid reimbursement." (Doc. 34 at ¶25). Taking the First Amended Complaint to be true and construing all inferences in Relator's favor, the submission of a claim that is merely late cannot be deemed to be "false or fraudulent." To be deemed false or fraudulent, there must be some factual allegation that demonstrates falsity or deceit; at least something to show that OSF was attempting to mask the claims' untimeliness, such as an allegation that dates on the claims were falsified, doctored or somehow erroneous. *See, e.g., United States ex rel. Durcholz v. FKW Inc.*, 997 F. Supp. 1159, 1167 (S.D. Ind. 1998) aff'd, 189 F.3d 542 (7th Cir. 1999) ("In short, the false claim must be a lie."). In this case, a claim that the CPR+ program caused the DME claims to show incorrect dates would suffice. However, Relator has not made such an allegation. Instead, Relator's allegations that the untimely claims are false claims must fail as a matter of law.

## 2. Relator Has Not Pled Facts That Demonstrate OSF Was Required To Provide A Statement Or Certification To Get Reimbursed For DME Claims From The Governments.

In addition to alleging that many DME claims that were purportedly false because they were untimely, Relator also alleges OSF submitted DME claims that were rife with errors of information material to the Governments' decisions to pay the claims. Relator alleges these DME claims are not false in and of themselves, but that the files that document these claims contain insufficient and error-ridden information. In the Amended Complaint, Relator alleges:

OSF knowingly submitting thousands of DME claims where its patient files either had (a) missing information, or (b) erroneous and/or incomplete information as to statements of medical necessity, physician orders, diagnoses, physician names, and/or other information all of which was required to be in OSF's file, subject to production on request, and in some cases subject to certification as a condition to receiving payment. The Defendant's failure to maintain these files as required constitutes Medicare abuse and /or fraud.

20.     In particular, certain claims were filed without documentation that is a necessary prerequisite in order to bill Medicare for payment.

(Doc. 34 at ¶¶ 19 and 20). The upshot of Relator's theory regarding these timely, yet fraudulently reimbursed DME claims, is that "required information was asserted as present in the billing records but either did not exist or was not available as required for proper billing, and this failure is the basis of the abuse and fraud claim." (Doc. 34 at ¶29).

Relator has identified regulations that state 1) payment to a provider of services is precluded unless information as may be necessary to determine the amounts due the provider is furnished upon request; 2) all items billed to Medicare require a prescription and an order kept in a file that documents certain information, but that items not meeting these requirements can be assigned "an EY modifier to the corresponding FICPCS code"; and 3) records of dispensing orders must be maintained and contain certain information. (Doc. 34 at ¶23).

None of the regulations identified by the Relator in the First Amended Complaint mandate certification or otherwise required OSF to make any statement to the Governments before seeking payment for DME claims. While the regulations above indicate Medicare expected documentation to be maintained, there is no indication that service providers, such as OSF, had to present documentation as a

prerequisite to submitting claims for payment or receiving money. Indeed, the regulations state that documentation was required to be kept available only upon request. The regulations for prescriptions quoted by the Relator even allow the provider to enter a special "EY Modifier" code when the provider cannot comply with the prescription requirements.

In paragraph nineteen, Relator also makes a general statement that "in some cases [submission of the claims was] subject to certification as a condition to receiving payment." This general statement is not sufficient to satisfy the pleading requirements under Rule 8, let alone Rule 9(b). *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009) ("in considering the plaintiff's factual allegations, courts should not accept as adequate abstract recitations of the elements of a cause of action or conclusory legal statements."). Relator does not cite an actual source for any certification requirement.

Instead, Relator states that "the placing of an approval code on the claim indicates to Medicare and Medicaid the required documents are in OSF's files or available from the patient's medical records." (Doc. 34 at ¶29). Relator seems to be alleging some sort of an implicit certification theory of liability. His theory is that by placing an approval code on a claim that lacks proper documentation, OSF was effectively making a false statement or certification that the claim was properly documented. The problem is that Relator has not identified any requirement that OSF had to certify or state the DME claims were properly documented before submitting them for payment. These sorts of false claims theories—premised upon implicit certification without a citation to a duty to certify or affirmatively state

compliance with an applicable rule or regulation—have been squarely rejected by several Courts of Appeals. *See, e.g., United States ex rel. Siewick v. Jamieson Science and Engr., Inc.*, 214 F.3d 1372, 1376 (D.C. Cir. 2000)("[A] false certification of compliance with a statute or regulation cannot serve as the basis for a qui tam action under the FCA unless payment is conditioned on that certification."), *United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1266 (9th Cir. 1996) ("It is the false certification of compliance which creates liability when certification is a prerequisite to obtaining a government benefit."). For these reasons, the First Amended Complaint does not allege plausible violations of 31 U.S.C. §3729(a)(1)(B) with regard to the DME claims.

Additionally, the First Amended Complaint still does not allege facts that convey that OSF actually submitted any of the DME claims at issue for reimbursement. Relator provides an excerpt of a training document produced on July 13, 2011 that in his words "reflect[] 9,213 claims marked as 'ready to bill' for submission to several insurers, including Medicare/Medicaid" as Exhibit A. (Doc. 34 at 9). This exhibit includes examples of "actual claims and/or accounts" that the Relator believes have a seventy to seventy-five percent error rate because they were either too old to be reimbursed and/or contained errors and omissions of required information such as statements of medical necessity, physician orders, diagnoses, physician names, modifiers, non-billable items listed on the claims, insurance validation.

Exhibit A shows these claims are marked ready to be billed, which infers that they were not actually billed and cannot satisfy the second prong of the §

3729(a)(1)(A) pleading requirement, which is that the claims were presented to the government for payment. *Caremark RX, L.L.C.*, 496 F.3d at 740. Exhibit A also shows an icon on the screen shot entitled "Create Invoice (F9)" that presumably would allow one to generate an invoice if one so chose. The "Create Invoice (F9)" icon, along with the fact that Relator has not described or referred to any invoices, bills or receipts of payments made by the Government in his Amended Complaint or exhibits, only strengthens the inference that these claims were not invoiced and actually submitted for payment to and/or paid by the Governments.

Relator continues to argue that under *United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849 (7th Cir. 2009), invoices are unnecessary and he has pled sufficient facts to infer either that the DME claims submissions actually occurred or that he can prove they were submitted and reimbursed ultimately after the case has progressed through discovery. As this Court already explained in its January 31 Order and Opinion (Doc. 30 at 10-11), in *Lusby*, the relator was an engineer, not an employee with any type of connection to the defendant's billing operations. 570 F.3d at 850. The relator in *Lusby* complained that despite contractual obligations to deliver quality parts to the government and to certify to the quality of such parts as a condition of remuneration, the defendant had in fact knowingly submitted inferior parts and billed and collected payment for such inferior parts. 570 F.3d at 853. The defendant claimed the relator's inability to produce an actual invoice doomed his claim. *Id.* at 854. The relator did not possess an actual bill or invoice, but he alleged specific parts, dates, and details of payment in his complaint. *Id.* In short, the

relator provided specific factual allegations concerning how the defendant submitted false claims to the government. *Id.* at 853-54.

In stark contrast to the relator in *Lusby*, 570 F.3d at 850, Relator here was deeply involved in OSF's billing. Relator alleges he was the Director of Reimbursement and was responsible for planning, directing, executing and evaluating the billing and reimbursement functions for OSF. (Doc. 1 at 5). Despite his familiarity and access to OSF's billing and reimbursement procedures, Relator does not allege any dates, amounts, or other details of actual payments in the First Amended Complaint that would allow the Court to infer DME claims were actually submitted and/or reimbursed by the Governments.

The complaint in *Lusby* did not leave the court to speculate on whether claims were ever submitted. The relator in *Lusby* knew of and pled specific details about the underlying contract and requisite facts that supported his allegations, but was unable to present information evidencing actual payment by the government. 570 F.3d at 853-54. Here, Relator does not allege any facts from which a court can fairly conclude the DME claims at issue were even submitted for payment and reimbursed. To the contrary, the First Amended Complaint still presents factual allegations that lead the Court to the conclusion that these DME claims were not submitted for reimbursement.

For example, throughout the First Amended Complaint, Relator uses language which casts doubt on whether the claims at issue were submitted to the Governments. For instance, Relator states he "*believes* that these claims were filed,

as CFO Muck informed Relator to do so" (Doc. 34 at ¶30), and "[t]hese claims were released *or prepared for release* over the Relator's objection" (emphasis added).

The First Amended Complaint also alleges that CFO Muck was not only prepared to write these claims off but she actually approved the write off. (Doc. 34 at ¶36). Such action conveys no other impression other than the CFO was willing to <u>not seek reimbursement</u> for the alleged DME claims. Lastly, Relator's own Exhibit E is an email in which the OSF accounts Receivable Manager explains to CFO Muck that the billing errors are resulting in OSF <u>not getting paid</u>. (Doc. 34-1 at 12 (emphasis added)).

The only evidence that Relator offers to show that claims were actually submitted and reimbursed is Exhibit G, which 1) only applies to late claims and 2) does not actually demonstrate claims were submitted and reimbursed. Exhibit G is an OSF Accounts Receivable Summary for May and July of 2011 that shows OSF expected amounts from services rendered more than 365 days prior from payers such as Medicare and Medicaid. It also shows that these expected amounts decreased significantly from May to July. Relator contends this is evidence that OSF submitted late claims to Medicare and Medicaid and was reimbursed, thereby causing the decrease in amounts. However, this exhibit does not demonstrate that OSF received any payments; it only shows that OSF's expectations changed. The exhibit offers no insight into the cause of the change in expectation. The change in expectation could be attributable to CFO Muck's decision to write off claims given the Relator's allegations she approved a write-off.

After reading the First Amended Complaint in the light most favorable to the Relator, there are no plausible allegations that the untimely DME claims were false or fraudulent, that OSF was obligated to make any certifications or statements of compliance before submitting DME claims for reimbursement, or that OSF actually submitted the DME claims in question to the Governments for reimbursement. Relator has only pled allegations that support the conclusion that the CPR+ software allowed untimely claims to exist in the OSF system as "ready to be billed" with errors or missing documentation in the corresponding OSF's files. This is not a plausible allegation that OSF obtained government payments through the submission of knowingly false or fraudulent claims. Therefore, the Court concludes that the DME scheme as pled does not state a claim upon which relief can be granted as violations of the federal or Illinois FCA.

As this is the second time Relator has attempted to plead sufficient FCA violations in regard to the DME claims and the Court is of the opinion that he will never be able to do so. Consequently, Counts I, II, IV and V are dismissed with prejudice.

## II.    Conspiracy Counts III and VI.

Relator alleges two counts of conspiracy. Count III alleges "Defendant knowingly conspired to defraud the United States by getting false or fraudulent claims allowed or paid by the United States" in contravention of 31 U.S.C. § 3729(a)(1)(C). Count VI alleges "Defendant knowingly conspired to defraud the State of Illinois by getting false or fraudulent claims allowed or paid by the State of Illinois" in contravention of 740 ILCS 175/3(a)(1)(C). Defendants contend that

Relator has ignored the Court's previous explanation of how the "intracorporate conspiracy doctrine" bars conspiracy claims under 31 U.S.C. § 3729(a)(1) where all the alleged conspirators are actors within the same corporate entity and also failed to sufficiently allege an agreement amongst co-conspirators. (Doc. 30 at 15-16, n. 8).

The Seventh Circuit has held that "general civil conspiracy principles apply" to FCA conspiracy claims. *United States ex rel. Durcholz v. FKW Inc.*, 189 F.3d 542, 545 n. 3 (7th Cir. 1999) (citing *United States v. Murphy*, 937 F.2d 1032, 1039 (6th Cir. 1991)). The "intracorporate conspiracy doctrine" bars conspiracy claims under 31 U.S.C. § 3729(a)(1) where all the alleged conspirators are actors <u>within the same corporate entity</u>. *United States ex rel. Chilcott v. KBR, Inc.*, No. 09-CV-4018, 2013 WL 5781660, at *10-12 (C.D. Ill. Oct. 25, 2013); *see also U.S. ex rel. Brooks v. Lockheed Martin Corp.*, 423 F. Supp. 2d 522, 528 (D. Md. 2006) aff'd in part, dismissed in part, 237 F. App'x 802 (4th Cir. 2007). In its second attempt to plead valid conspiracy claims, Relator has established that his claims are barred by the intracorporate conspiracy doctrine.

In the original Complaint, Relator's allegations of conspiracy were so vague that the Court could not identify who the alleged co-conspirators were. The Court was left to speculate whether Relator was alleging that OSF Healthcare System and OSF Home Care Services conspired together or whether OSF and the claims processing program vendors, CPR+ and McKesson, were the purported co-conspirators. (Doc. 30 at 15-16). Now Relator has cured the ambiguity and names OSF's CFO, Belinda Muck (Doc. 34 at ¶37), and several other OSF officers and

employees (Doc. 34 at ¶33), as OSF's co-conspirators.[5] These claims fail as a matter of law.

Both federal and Illinois law bar the respective conspiracy claims brought by the Relator in this action. The First Amended Complaint alleges facts that clearly show CFO Muck and other OSF employees were acting in the course of their duties in furtherance of their employer's interests at all times relevant. For example, at paragraph fifty-nine, Relator states "the Defendant engaged in conduct among its employees to conspire to defraud the Government by getting false or fraudulent claims allowed or paid." In paragraph forty, he alleges he "was being pressured to process the outstanding claims as fast as possible in order to maximize the revenue that could be presented at the August 2011 OSF Board meeting and also partly to avoid more claims being declined as untimely." Thus, Relator is contending that the supposed co-conspirators were acting as OSF employees to maximize OSF revenue.

As the Court has already explained, the "intracorporate conspiracy doctrine" bars federal conspiracy claims under 31 U.S.C. § 3729(a)(1) where all the alleged conspirators are actors within the same corporate entity. *United States ex rel. Chilcott v. KBR, Inc.*, No. 09-CV-4018, 2013 WL 5781660, at *10-12 (C.D. Ill. Oct. 25, 2013). "A corporation is, therefore, incapable of conspiring with its employees,

---

[5] In paragraph 33 of the First Amended Complaint, Relator alleges "[t]he listed attendees to the meeting conspired to ignore the correct procedures, and allow the claims to continue to be filed." Exhibit C confirms the listed attendees were Cindy Bauling, Gail McGinnis, Chris Gibson, JJ Guedet, Cindi Hoggard, Donna Medina, Belinda Muck, AJ Querciagrossa, Ginger Reynolds, Amy Trau, Felicia Schafer, Rachel Hays, Patti Atteberry, Jon McKee, Deb Vielbak, Paul Harbaugh and Brian Schofield. (Doc. 34-1 at 7). Despite that Relator was himself an attendee to the meeting, the Court will assume Relator does not mean to implicate himself as a potential co-conspirator.

and its employees, when acting in the scope of their employment, cannot conspire among themselves." *United States ex rel. Woods v. SouthernCare, Inc.*, 3:09-CV-00313-CWR, 2013 WL 1339375, at *6 (S.D. Miss. 2013) (quotation marks and citation omitted). Similarly, under Illinois law, "a civil conspiracy cannot exist between a corporation's own officers or employees." *Van Winkle v. Owens-Corning Fiberglas Corp.*, 683 N.E.2d 985, 991 (Ill. App. 4th Dist. 1997). This is so because the acts of an employee are deemed to be the acts of the corporate employer, and an entity cannot conspire with itself. *See Buckner v. A. Plant Maint., Inc.*, 694 N.E.2d 565, 571 (Ill. 1998) (explaining that because "the acts of an agent are considered in law to be the acts of the principal, there can be no conspiracy between a principal and an agent" while upholding the dismissal of a civil conspiracy claim). Thus, under both federal and Illinois law, a corporation cannot be deemed to conspire with its own employees and officers to accomplish corporate acts and objectives.

After two attempts to plead facts that establish conspiracies to violate the federal False Claims Act, 31 U.S.C. § 3729 *et. seq.* and its Illinois counterpart, Relator has been unable to plead viable conspiracy claims. Originally, the Relator failed to identify a co-conspirator, now Relator has accused persons who cannot be deemed as co-conspirators under the law. There is no reason to conclude that Relator will ever be able to plead viable claims of conspiracy amongst OSF and its employees to submit the false claims at issue in the First Amended Complaint. Consequently, Counts III and VI are dismissed with prejudice.

### III.    Retaliation Claims

In Counts VII and VIII, Relator alleges that OSF "threatened, harassed, and discriminated against Relator in the terms and conditions of his employment because of the lawful acts done by Relator in furtherance of an action under this section." (Doc. 34 at ¶¶62, 84-86, 18-19). Count IX was not dismissed by the Court. That count provides that OSF retaliated against him "for refusing to participate in activities that would result in a violation of State or Federal laws, rules or regulations." (Doc. 1 at 20; Doc. 34 at 24-25).

In order to survive a motion to dismiss, a complaint alleging FCA retaliation claims brought pursuant to 31 U.S.C. §3730(h)(1) and 740 ILCS 175/4(g)(1) must contain factual allegations that if proven would establish that 1) the Relator was acting in furtherance of an FCA enforcement action or other efforts to stop violations of the FCA, 2) the employer knew Relator was engaged in protected conduct, and 3) the employer was motivated to take an adverse employment action against the Relator because of the protected conduct. 31 U.S.C. § 3730(h) (2012); *Brandon v. Anesthesia & Pain Mgmt. Assocs., Ltd.*, 277 F.3d 936, 944 (7th Cir. 2002); *see, e.g., United States ex rel. Wildhirt v. AARS Forever, Inc.*, No. 09 C 1215, 2011 WL 1303390, at *6 (N.D. Ill. Apr. 6, 2011). Courts analyze the conduct the Relator engaged in and his purpose for doing so to help determine whether these elements have been sufficiently pled. *Luckey v. Baxter Healthcare Corp.*, 2 F.Supp.2d 1034, (N.D. Ill. 1998), *aff'd by* 183 F.3d 730 (7th Cir. 1999).

This Court has found 1) that Relator has not successfully pled false or fraudulent DME claims or Home Health Service claims, 2) that his allegations do

not support that OSF made false or fraudulent statements to obtain payments for DME claims, and 3) that the allegations make it plausible that the DME claims at issue were not submitted to the Governments.[6] Without finding that the Relator has sufficiently pled underlying violations of the FCA, the Court cannot conclude that the allegations support a finding that Relator was acting in furtherance of an FCA enforcement action or other efforts to stop violations of the FCA.  Thus, Counts VII and VIII are dismissed.

Additionally, Relator's retaliation allegations must fail for the separate reason that his allegations do not support that he was engaged in furtherance of an FCA action. In general, section 3730(h) allows an employee to be compensated if that employee is discriminated against in the terms and conditions of her employment because of lawful acts done by such employee in furtherance of an FCA action under this section **or** other efforts to stop violations of the FCA. Thus there are two distinct ways to prove liability for retaliation under §3730(h); one must either prove she put her employer on notice that she was contemplating an FCA action or prove she was otherwise engaged in other efforts to stop FCA violations.

This Court clearly admonished Relator that his retaliation allegations did not suffice to show he was engaged "in furtherance of an FCA action," but rather that he was more plausibly engaged "in other efforts" to stop what Relator thought were violations of the FCA. Despite that admonition, Relator has deliberately chosen to re-plead these counts by again only contending that his actions were in furtherance

---

[6] Relator has not made any allegations that he took any action in regard to the Home Health Service claims to precipitate OSF retaliation.

of an FCA action, not that he was otherwise engaged in other efforts to stop violations of the FCA.

The allegations do not suffice to show that Relator was engaged "in the furtherance of an FCA enforcement action." Relator alleges he informed his OSF superiors that submitting the DME claims would be fraud. (Doc. 34 at 10). He also lodged internal complaints with the OSF Compliance Committee. (Doc. 34 at 13). He told his CFO that if OSF submitted the DME claims he would have to report it because he is a licensed Nursing Home Administrator. (Doc. 34 at 12). Relator does not say to whom he would report the submission though nor does he provide any nexus between the profession of Nursing Home Administrator and the False Claims Act or its Illinois equivalent. Despite the foregoing, the Relator's conduct was squarely aimed at preventing OSF from submitting the DME claims. So to the extent he believed OSF's actions to be violations of the FCA, Relator's actions could plausibly be read to constitute "efforts to stop violations of the FCA."

But the case law is clear that simply informing one's employer that certain actions are "illegal," "improper," or "fraudulent," without any explicit mention of the possibility that the employee may sue, will not suffice to show the Relator was acting in furtherance of an FCA enforcement action. *Brandon*, 277 F.3d at 944-45 (court held merely trying to convince superiors to comply with Medicare billing regulations did not constitute protected activity). This is especially true for an employee like the Relator, whose duties included planning, directing, executing and evaluating the billing and reimbursement functions for OSF. *Id.* at 945; *Fanslow v. Chicago Mfg. Ctr., Inc.*, 384 F.3d 469, 484 (7th Cir. 2004).

The Court is of the opinion that Relator will be unable to ever plead facts that will establish he was acting in furtherance of an FCA action. Moreover, since Relator has clearly chosen to disregard the Court's guidance regarding pleading that his actions amounted to "other efforts" under the federal and Illinois FCAs, these retaliation claims are dismissed with prejudice.

## CONCLUSION

For the reasons stated above, Counts I, II, III, IV, V, VI, VII and VIII are dismissed with prejudice under Federal Rules of Civil Procedure 12(b)(6). Due to the nature of the deficiencies described in this Order and Opinion, as well as Relator's failure to heed the Court's clear guidance in some instances, the Court finds it appropriate to disallow Relator any further leave to amend his complaint. Count IX, an Illinois state law claim, is dismissed without prejudice as the Court has decided not to retain supplemental jurisdiction over this action. *See* 28 U.S.C. § 1367(c)(3).

IT IS THEREFORE ORDERED that Defendant's Motion to Dismiss (Doc. 35) is GRANTED. CASE TERMINATED.


Entered this <u>1st</u> day of July, 2014.


                                        s/ Joe B. McDade
                              _____
                                    JOE BILLY McDADE
                              United States Senior District Judge